# United States Court of Appeals for the Federal Circuit

05-3302

BENNETT S. GREENSPAN,

Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent.

Robert L. Hess, II, Husch & Eppenberger, LLC, of Jefferson City, Missouri, argued for petitioner.  With him on the brief was Harvey M. Tettlebaum.

Kenneth M. Dintzer, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent.  With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Harold D. Lester, Jr., Assistant Director, and Kelly B. Blank, Attorney.  Of counsel on the brief was Daniel C. Rattray, Attorney, Office of Regional Counsel, United States Department of Veterans Affairs, of St. Louis, Missouri.

Appealed from:  United States Merit Systems Protection Board

# United States Court of Appeals for the Federal Circuit

05-3302

BENNETT S. GREENSPAN,

Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent.

_____

DECIDED:  September 8, 2006

_____

Before NEWMAN, MAYER, and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge NEWMAN.  Dissenting opinion filed by Circuit Judge RADER.

NEWMAN, Circuit Judge.

Dr. Bennett S. Greenspan petitions for review of the decision of the Merit Systems Protection Board, Docket No. CH1221010192-B-1, denying his request for correction of disciplinary actions taken in retaliation for certain critical statements that he made while he was Medical Director of the Nuclear Medicine Section at the Harry S. Truman Memorial Veterans Hospital in Columbia, Missouri.  He invokes the protection of the Whistleblower Protection Act, 5 U.S.C. §2302(b)(8) (the WPA).  The Board upheld the agency's position

that the letter of reprimand and reduced proficiency rating would have been given because of the manner in which the protected disclosure was made, independent of the content of the disclosure; thus the Board ruled that Dr. Greenspan was not entitled to the protection of the WPA.[1] We conclude that the Board erred in law, for the WPA does not contemplate removal of protection when protected subject matter is stated in a blunt manner. We remand to the Board for application of the protection of the WPA to Dr. Greenspan, and determination of appropriate remedy.

## BACKGROUND

Dr. Greenspan was elected by the Truman Hospital's medical staff to serve as Medical Staff Representative to the hospital management. The events at issue occurred at a Medical Staff meeting on March 1, 1999. A few months earlier the Medical Staff had taken a vote of "No Confidence in the leadership" of Ms. Pat Crosetti, Chief Executive Officer of Veterans Integrated Service Network 15 (VISN), a network of eight veterans hospitals and forty clinics, headquartered in Kansas City, Kansas. This was Ms. Crosetti's first visit to the Truman Hospital after that vote, and she had been informed of the result. The purpose of her visit, Ms. Crosetti testified before the MSPB, was to "hear concerns and issues and let the medical staff know the strategic direction and the fiscal well-being, or lack thereof, of the budget, and the management issues we were going to raise and that we were going to address for the next couple of quarters and usually out a year or two." At the meeting Ms. Crosetti spoke to the staff, and then the floor was opened for a question and

---

[1] Greenspan v. Dep't of Veterans Affairs, No. CH1221010192-B-1, 2004 MSPB LEXIS 2871 (June 8, 2005).

answer session. Dr. Greenspan spoke for about five minutes, making the statements here

at issue. Following are his remarks as recorded at the staff meeting and played at the

MSPB hearing, as transcribed in the record:

<u>Dr. Greenspan</u>: As you probably know, I have been trying to change some things in this Network for quite awhile, and I have had -- I've got a number of observations and complaints, and I think it's useful for other people to know about this.

First of all, I think that we have a very fine staff here in this hospital (inaudible), and we work very well as a team. I'm not sure the managers are on the same team. It seems that the majority of our staff members have not been pleased with the way things have been run in the last couple of years. And it's not just a small local minority. I've been quite loud about this, but I'm willing to speak up. A lot of people aren't. But that doesn't mean they're not dissatisfied with things. An overwhelming majority of our full time physicians voted no confidence a few months ago, and we're not the only hospital that feels that way. There are a number of physicians in St. Louis, Leavenworth, and Topeka that feel the same way. And the physicians in Kansas City voted overwhelmingly for a professional union for the same reasons we did. Lack of physician input, lack of participation in the decision-making process. And I think that needs to change.

You know, you're -- you don't have much of a background in medicine, and I think that you can't possibly understand a lot of the nuances that probably provide good medical care. That by itself is okay, but you haven't been willing to listen, and if we tell you something, it's because we're trying to provide the best possible care to our veterans. I think that to ignore that is a prescription for disaster.

In addition, there a number of other -- there are a number of other (inaudible). For one thing, I think when you started here, you should have gone around observing the Network better. You should have gone around the Network and realized that -- to try to take positive advantage of all of the good programs we've had throughout the Network. Our cardiology program is certainly one of them. Geriatrics is another one. I think you should have realized that this is a dual position. And instead of trying to dismantle our cardiac program, you should've tried to support it. We sure got the feeling that you were trying to dismantle it by taking our proposal and sending it out throughout the Division and having other people bid on it. And there is no possible way that the private hospitals could match our costs because our costs are less than Medicare rates, and they've got to make a profit, which we don't have to do.

But in general, there has been a major problem with lack of input, and when we do provide input, it hasn't been listened to. We're also having problems with loss of veterans' preference jobs at the same time Congress is trying to support that and promote it. What I'm referring to specifically is the deal with Canteen Service, where you've mandated Canteen Service and the nutrition service merge throughout the VISN. There's a problem with that. For one thing, it's a loss of veterans' preference jobs. For another thing, it turns out that there is a conflict of interest there because Mayi Canales, who is the business director of the VISN, is married to a guy that who is high up in the Canteen Service, and so at the very least there's a conflict. At worst, there is public loss for private gain. That's a prohibitive personnel practice.

And on top of that, there have been other prohibitive personnel practices such as nepotism with your husband being the Chief Dental Advisor, and this is after he was -- he's not on the Dental Examiner's Board, but (inaudible). This in itself is probably okay, although I don't know why the (inaudible) also couldn't be the subject-matter of (inaudible), but to make him the Chief Dental Advisor was fully above and beyond reason. And he did step down on December 2nd, by the way.

And then there have been issues of reprisal, which are also prohibitive, and we want this to stop. It's got to stop. Again, because we have a high quality of staff here, and we're trying to do the best we can to provide care to our veterans and that kind of stuff doesn't really belong here frankly. I mean, our position is to try and do the best job we can with the resources we have. I realize though that it's difficult to -- we have (inaudible) problem coming up, but that doesn't mean we should do things that are illegal (inaudible).

Unidentified Speaker: Do you have a question?

Dr. Greenspan: Do I have a question? Well, I guess I do. It's a little bit off the wall, but I understand you are working on a Ph.D. and my question is -- I've heard a rumor that the topic is on ethics. Is that true?

Unidentified Speaker: That's personal.

Dr. Greenspan: Well, the reason I asked you this is that there is a problem of ethics in the way things have been run. There are a lot of things that have been done that's (inaudible), and that's got to stop also.

Tom Sanders: I am publicly humiliated by the -- you haven't brought up anything new regarding -- you're rehashing stuff that has been there for ages

and everybody has talked about, and I don't know what the purpose of that would be except to try to publicly humiliate someone, and I am ashamed.

Dr. Greenspan:  But I'm trying to point out there are some issues here that we do need to address and we do need to correct.  For example, in terms of clinical activities --

Tom Sanders: Let's get to -- if you are arguing specific (inaudible) specific (inaudible) that haven't been rehashed, that's what we're here for.

Dr. Greenspan: One of them is the (inaudible) business where we have been -- up until recently, we have been sending those tests across the street to (inaudible).  And as most of you probably know, this is a test to look at hemoglobin A1c testing and handling their blood sugar levels.  The lab across the street is one that -- Dr. Goldstein has been providing that for us for a long time.  I understand now that we're mandated to do the test here also.  The problem is that the test here doesn't have the same accuracy rate, and we're concerned that it may turn a very accurate test into a marginal -- a marginally useful one.

MSPB Record at 266-74.  The record states that three other physicians also criticized the management of the hospital at that meeting.  The meeting ended when Ms. Crosetti left the room.

The minutes of the meeting, signed by Dr. Philip B. Dobrin, the Chief of Staff of the Truman Hospital, stated that "Dr. Bennett Greenspan engaged in a personal attack upon the network management present, and accused the Chief Executive Officer of engaging in illegal activities and unethical practices."  He described Dr. Greenspan's statements as "grossly inappropriate."  Dr. Edward Adelstein wrote an addendum to the minutes, stating his "disagreement" with "the description of the role that Dr. Greenspan played in the emotional outburst displayed by Mrs. Crosetti," and that, "[w]hile the entire staff is sorry for any emotional discomfort that we caused the VISN director, her actions were driven by interactions with Drs. Demmy, Watson and Parker as well as Dr. Greenspan."

Dr. Greenspan also added a statement to the minutes, stating that "Dr. Parker also stated that our VISN CEO had to take some ownership for consequences of her decisions made in the VISN office," after which Ms. Crosetti "lost her composure, essentially threatened our entire hospital, and stormed out of the meeting." Dr. Greenspan wrote that the issues he had raised reflected the concerns of the "overwhelming majority of our medical staff." Another written comment to the minutes, by Dr. Terry S. Hoyt, states: "Both Dr. Adelstein's and Dr. Greenspan's comments are pertinent."

Several of those in attendance wrote apologies to Ms. Crosetti; for example, Dr. Gail Wright wrote that "the doctors who spoke are a small and much too vocal faction"; Dr. Karen Zanol wrote that "Drs. Greenspan and Parker were both inappropriate in their remarks." Dr. Greenspan also wrote to Ms. Crosetti: "My personal comment regarding your Ph.D. thesis was inappropriate, and I am sorry for making that comment. Some of my other comments were of a personal nature, which was also inappropriate, and for that also I am sorry. I realize that my comments were disruptive . . . ."

Three weeks after the meeting, on March 22, 1999, Mr. Campbell, Director of the Truman Hospital, issued a Notice to Dr. Greenspan stating: "I am, therefore, suspending you for three days for your conduct at this open meeting in which you engaged in a personal attack on the Network CEO." This Notice was rescinded for "procedural errors" and on March 31, 1999 a new Notice was issued, proposing that Dr. Greenspan would be suspended for one day for making "unfounded statements which were defamatory about a senior VA official," and stating that he had the right to reply orally or in writing. Dr. Greenspan replied orally on June 29, 1999 to Dr. Carol Lake, Chief of Staff at Roudebush VA Medical Center in Indianapolis, Indiana, who was appointed as Hearing Officer by Mr.

Kenneth Clark, the Chief Network Officer and designated deciding official. Upon consideration of Dr. Greenspan's reply, Dr. Lake recommended that Dr. Greenspan instead should receive "positive" disciplinary action in the form of attendance at a formal program on the business of medicine, and mentoring about organizational behavior and effective communication. Mr. Clark rejected Dr. Lake's recommendation and issued a formal letter of reprimand on September 17, 1999.

In the reprimand Mr. Clark acknowledged Dr. Greenspan's entitlement to express opinions at a medical staff meeting, but criticized the "statements about a senior VHA management official at the March 1, 1999, Medical Staff meeting" that were presented in "a derogatory, inflammatory and inappropriate manner." On August 16, 1999 Dr. Hoyt, Dr. Greenspan's immediate supervisor, completed Dr. Greenspan's proficiency evaluation for the year ending July 7, 1999; Dr. Hoyt rated Dr. Greenspan as "High Satisfactory" in all categories. On August 19, 1999 Dr. Dobrin lowered Dr. Greenspan's proficiency rating for "Personal Qualities" from "High Satisfactory" to "Satisfactory."

Dr. Greenspan filed a request for corrective action with the Merit Systems Protection Board, claiming that the agency had retaliated for his "whistleblowing" by issuing the letter of reprimand and by reducing his proficiency rating. On March 20, 2001 the administrative judge dismissed the petition for lack of jurisdiction on the grounds that the lowering of a proficiency rating was not a personnel action under the WPA, and that the letter of reprimand was outside of the Board's jurisdiction because the record showed that Dr. Greenspan had elected to pursue that aspect through grievance under a collective bargaining agreement.

Dr. Greenspan appealed to the full Board, which held that he had made nonfrivolous allegations that he had engaged in protected activity and that protected disclosures were a contributing factor in the agency's disciplinary action. The Board rejected the administrative judge's conclusion that Dr. Greenspan had elected the grievance procedure, finding that the record did not support this conclusion. The Board held that Dr. Greenspan had established its jurisdiction under the WPA.

The Board, at this stage of the proceedings, presumed that Dr. Greenspan's disclosures were protected, that the agency's actions were adverse personnel actions within the meaning of §2302, and that his disclosures were a contributing factor to the agency's actions. To prevail on these premises, the agency had to establish that it would have taken the same actions in the absence of the protected disclosures. Horton v. Dep't of the Navy, 66 F.3d 279, 284 (Fed. Cir. 1995). The Board remanded to the administrative judge for determination of whether the agency could establish, by clear and convincing evidence, that it would have taken the same actions in the absence of protected disclosures. The Board instructed that if this defense were not established, the administrative judge should determine whether the disclosures were protected and whether the agency took actions that constitute personnel actions under the WPA because of those protected disclosures.

On remand, the administrative judge noted that Dr. Greenspan had resigned in July 2000 and the disciplinary actions had been removed from his personnel file, but his "request for corrective action" was not thereby moot "because he may be entitled to an award of consequential damages if he prevails." Greenspan, 2004 MSPB LEXIS 2871, at *2 n.1. The administrative judge held a hearing, and found that the agency would have

taken the same disciplinary actions even if Dr. Greenspan's statements were not protected, because his conduct was rude and disrespectful. The administrative judge dismissed Dr. Greenspan's appeal, and the full Board denied review. This appeal followed.

DISCUSSION

The WPA prohibits the taking of any adverse personnel action because of "any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences -- (i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health and safety . . . ." 5 U.S.C. §2302(b)(8)(A). Dr. Greenspan argues that there was not substantial evidence to support the Board's holding that the agency would have issued the Letter of Reprimand and reduced his proficiency rating for Personal Qualities in the absence of the protected disclosures.

When determining whether the agency action would have been taken in the absence of the employee's whistleblowing disclosures, the Board in Geyer v. Department of Justice, 70 M.S.P.R. 682, 688 (1996), aff'd, 116 F.3d 1497 (Fed. Cir. 1997) (Table), identified several factors that may be considered, including the strength of the agency's reason for the personnel action when the whistleblowing is excluded; the existence and strength of any motive to retaliate for the whistleblowing, and any evidence of similar action against similarly situated employees for the non-whistleblowing aspect alone. In Carr v. Social Security Administration, 185 F.3d 1318, 1323 (Fed. Cir. 1999), the Federal Circuit endorsed the analytic parameters set forth in Geyer for determining whether "an agency has carried its burden of establishing by clear and convincing evidence that it would have taken the

05-3302                                          9

personnel action at issue in the absence of the disciplined employee's protected disclosure(s)."

The agency does not dispute that the actions against Dr. Greenspan were taken in retaliation for his statements at the March 1 staff meeting. Indeed, the Letter of Reprimand charged Dr. Greenspan with making "unfounded statements which were defamatory." The agency argues that he was disciplined for derogatory, inappropriate, and disrespectful "conduct," not for the content of his words. The agency states that Dr. Greenspan was on notice that this "conduct" was the basis of the disciplinary action because it was referenced in the Notice of Proposed Suspension, which stated: "(3) In a very blunt and arrogant manner you accused Ms. Crosetti of performing prohibited personnel practices and conducting illegal contracting activities . . . ." The agency stresses it was the "unfounded nature" of Dr. Greenspan's statements, not the "content" of those statements, that resulted in the reprimand, and that it would have reprimanded Dr. Greenspan for making unfounded statements even if the statements were not protected whistleblowing disclosures.

The administrative judge, finding that Dr. Greenspan had made "inappropriate" comments and behaved with "open disrespect," Greenspan, 2004 MSPB LEXIS 2871, at *23-24, deemed it irrelevant that the letter of reprimand did not mention these aspects, but instead incorporated "Reason (1) to (4) as stated in the notice of proposed suspension":

> At the Medical Staff meeting held on March 1, 1999, you made unfounded statements which were defamatory about a senior VA official:
>
> (1) You accused Patricia A. Crosetti, VA Heartland Network 15 CEO, of specific illegal activities including nepotism with regard to her husband and;
>
> (2) You accused Ms. Crosetti of a conflict of interest regarding the consolidation of the Food Production program with the VA Canteen Service

since the Network Business Office Director, Ms. Mayi Canales, is married to the Assistant Director of the National VA Canteen Service and;

(3) In a very blunt and arrogant manner you accused Ms. Crosetti of performing prohibited personnel practices and conducting illegal contracting activities and;

(4) You bluntly accused Ms. Crosetti of unethical practices. You asked her, "I understand that you were studying for a Ph.D. In what area was that Ph.D.?" Dr. Dobrin interrupted you by saying that that was a personal matter. You then stated, "I understand that it was *Ethics* and you are not ethical!"[2]

Dr. Greenspan states that the grounds argued by the agency to the MSPB and on this appeal are not the same as the grounds stated by the agency in the letter of reprimand, "unfounded statements which were defamatory," for the agency now argues that his statements were unfounded and "disrespectful." He points to extensive evidence that his statements were well founded, citing the remarks of other staff physicians about management of the hospital. He states that he expressed these concerns not only for himself but as the designated spokesman for the medical staff. He stresses that the disciplinary actions were attributed to the content of his remarks, and that the present posture that he was properly disciplined for "disrespect" cannot be separated from the content of his whistleblowing criticisms of management.

A personnel action is reviewed on the grounds on which the agency based the action when it was taken. See Hawkins v. Smithsonian Inst., 73 M.S.P.R. 397, 401 (1997) ("the Board cannot consider or sustain charges or specifications that are not included in the notice of proposed adverse action"). Here the agency, after rescinding its first Notice,

---

2    The transcript, supra, does not match this statement.

stated the ground of "unfounded statements which were defamatory" in its Notice and Decision letter. Dr. Greenspan was not charged with "disrespect." The Board cannot change the agency's grounds from those Noticed by the agency at the time of the discipline. See King v. Nazelrod, 43 F.3d 663, 666 (Fed. Cir. 1994) ("We have mandated that the agency must prove all of the elements of the substantive offense with which an individual is charged"). Although Dr. Greenspan in his letter of apology described his remarks as "disruptive" he was not disciplined on that ground, and the MSPB did not, in its analysis, impose a "disruptive" component in addition to the grounds stated by either the agency or the administrative judge.

The agency argues that even if the statements were protected whistleblowing, discipline was appropriate if the protected statements were "unfounded and defamatory." Dr. Greenspan argues that there was no evidence that his statements were defamatory. The Board has defined defamation as the "unprivileged publication of false statements which naturally and proximately result in injury to another." Bonanova v. Dep't of Educ., 49 M.S.P.R. 294, 301-02 (1991). The Board did not find that Dr. Greenspan's statements were false, and the agency apparently did not attempt to prove falsity. However, the agency argues that Dr. Greenspan's statements were "unfounded," citing his testimony before the Board that he did not know with certainty whether Ms. Crosetti had actually "lobbied" to place her husband in charge of dental services, and that he did not know whether anyone had personally benefitted from the restructure of the VA's Canteen Service. The agency argues that his statements on these issues were "unfounded" because he did not have "concrete or specific knowledge" of wrongdoing. Dr. Greenspan responds that his criticisms were not of wrongdoing, but of possible conflict of interest, and

that his statements on these issues were not "unfounded statements which were defamatory." The agency responds that it has a legitimate interest in reprimanding employees that make unfounded statements, whether or not the statements meet the criteria of protected whistleblowing.

The purpose of the WPA is to shield employees who are willing to speak out and criticize government management, to "freely encourage employees to disclose that which is wrong with our government." Marano v. Dep't of Justice, 2 F.3d 1137, 1142 (Fed. Cir. 1993). The WPA by its terms includes and protects "any" disclosure that an employee "reasonably believes" evidences misconduct or mismanagement, 5 U.S.C. §2302(b)(8)(A). There was no evidence or allegation that Dr. Greenspan's statements were not "reasonably believed," and the record shows that several other physicians had similar concerns. Although wrongful or disruptive conduct is not shielded by the presence of a protected disclosure, see Watson v. Dep't of Justice, 64 F.3d 1524, 1528 (Fed. Cir. 1995), and Marano, 2 F.3d at 1142 n.5, when the disclosure is protected the burden is on the agency to show, by clear and convincing evidence, that it would have disciplined the employee for reasons unrelated to the protected disclosure. In this case, the charges are anchored in the protected disclosures themselves. See, e.g., Briley v. National Archives and Records Admin., 236 F.3d 1373, 1378 (Fed. Cir. 2001) (the agency must establish that it would have taken the same personnel action in the absence of the protected disclosure).

When a disclosure is of protected subject matter, it is more likely than not to be critical of management, perhaps highly critical. The WPA protects those employees who are willing to speak out on subjects that could incur retaliation if unshielded. We have not been shown substantial evidence in support of the agency's burden to establish by clear

and convincing evidence that it would have taken these disciplinary actions absent the protected disclosures. The Board's contrary finding cannot be sustained. We reverse the Board's decision, and remand for further proceedings including determination of the remedy appropriate to the improper disciplinary actions.

<u>REVERSED and REMANDED</u>

# United States Court of Appeals for the Federal Circuit

05-3302

BENNETT S. GREENSPAN,

Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent.

RADER, <u>Circuit Judge</u>, dissenting.

Because the Board correctly found that the agency would have reprimanded Dr. Greenspan even in the absence of protected disclosures, I must respectfully dissent.

During a staff meeting, Dr. Greenspan attacked his supervisor, Ms. Crosetti. Everyone at the meeting, including Dr. Greenspan himself, considered his personal attacks very inappropriate. Specifically, following the meeting, Dr. Greenspan sent Ms. Crosetti an apology, admitting that some of his comments were "inappropriate," "disruptive," and "personal in nature."

Because those comments may have been protected disclosures, this court today holds that Dr. Greenspans' inappropriate, personal, and disruptive comments cannot support a reprimand. Majority Opinion, 2. In other words, because Dr. Greenspan's comments may fall within the WPA, he may freely disrupt and disturb agency meetings. In this instance, Dr. Greenspan's conduct supports the reprimand upheld by the Board. In fact, disrespectful conduct merits a separate charge under the Agency's Table of Penalties. Thus, the agency, as the Board held, would have reprimanded Dr. Greenspan for his disruptive conduct regardless of the nature of his disclosures. In

sum, the agency's decision to reprimand Dr. Greenspan for his conduct outweighed any evidence that the proposing and deciding officials held retaliatory motives against him. Thus, the Board was, by no means, arbitrary in upholding that reprimand.

In addition to a letter of reprimand, the Board also upheld a lowered performance rating. The record, however, shows that Dr. Greenspan's overall proficiency rating was not lowered. Instead the agency changed Dr. Greenspan's rating for <u>personal qualities</u> from high satisfactory to satisfactory. Dr. Greenspan's supervisor made this change because his conduct at the March 1999 meeting was "really out of line." The supervisor also testified that Dr. Greenspan regularly failed to follow the proper chain of command in airing his complaints. Once again, the record underscores the propriety of these changes in Dr. Greenspan's personal qualities rating. From my vantage point, this court must really stretch to find the Board's decision arbitrary or unsupported by substantial evidence.